IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EDWIN A. BENNETT, JR., )
)
              Petitioner, )
)
              v. )      1:09CV647
)
STATE OF NORTH CAROLINA, et al., )
)
              Respondents. )

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

      Petitioner Edwin A. Bennett, Jr., a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court has reviewed the petition and the matters of record and concludes that Mr. Bennett is not entitled to relief.

## I. Procedural Background

      On July 18, 2008, in the Superior Court of Randolph County, Mr. Bennett pled guilty, pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), to four counts of attempted first-degree murder and one count of first-degree burglary in cases 06 CRS 57360, 06 CRS 57255, and 07 CRS 31. (Doc. 10-2.) He was sentenced to three consecutive prison terms of 94 to 122 months. (Doc. 10-3.) The first of these was concurrent with a shorter sentence that Mr. Bennett had received in Alamance County.[1] *Id.* Mr. Bennett did not appeal his convictions or sentences.

---

[1] Prison records from the North Carolina Department of Correction reflect that the Alamance County sentence was for twenty-seven to forty-two months for a second-degree kidnapping conviction. That sentence expired on October 26, 2010. *See* http://www.doc.state.nc.us/offenders (search for "Edwin A. Bennett" last completed Nov. 21, 2010). The Alamance County conviction and sentence are not challenged as part of this case.

Mr. Bennett thereafter filed a motion for appropriate relief in Randolph County, seeking post-conviction relief pursuant to state statute. (Doc. 10-4.) That motion was summarily denied on May 8, 2009. (Doc. 10-6.) Mr. Bennett then sought a writ of certiorari from the North Carolina Court of Appeals. (Doc. 10-7.) This was also denied. (Doc. 10-11.) Mr. Bennett next turned to this Court seeking habeas corpus relief. Following a procedurally deficient petition, Mr. Bennett filed a proper one. (Docs. 1, 5.) Respondents and Mr. Bennett have both filed motions seeking summary judgment. (Docs. 9, 13.) The parties' motions for summary judgment are now before the Court for decision.

## II. Facts

On October 23, 2006, police responded to a reported shooting in Randleman, North Carolina and found three wounded victims. (Doc. 21 at 13.) Gina Johnson had been shot once in her upper right thigh. *Id.* Her twelve-year-old daughter Mildred had been shot just above the knee of her left leg, in the elbow of her right arm, and in her back. *Id.* Ms. Johnson's fifteen-year-old son, Brandon, had been shot in both hands and through his lower jaw. *Id.* All were airlifted to the hospital and survived.

Gina Johnson testified at Mr. Bennett's sentencing hearing that Mr. Bennett had been her boyfriend and that he had a good relationship with her family. *Id.* at 45. In October of 2006, he began to get "too controlling," leading to what she thought was an amicable break-up the day before the shootings. *Id.* at 45-46. However, the next night, Ms. Johnson awakened to find Mr. Bennett in the bedroom of her apartment after he used his key to enter. *Id.* at 46. When Ms. Johnson first saw Mr. Bennett, he held two knives and two ice picks in his hands and had been cut across the face. *Id.* at 46-47. He said, "Look what that bastard did." *Id.* at 47. Initially confused, she learned that Mr. Bennett was referring to a man who lived across the street. *Id.* at

2

47-48. Mr. Bennett then put the knives and ice picks in his pocket and pulled out a gun. *Id.* at 48. Ms. Johnson and Mr. Bennett argued for a time before Mildred entered the room and saw the gun. *Id.* Mildred then awakened Brandon and both children came down the hallway. *Id.* at 48-49. Mr. Bennett saw them and threatened to kill them while putting the gun to Mildred's head. *Id.* at 49. The children left the room. *Id.*

Mr. Bennett forced Ms. Johnson out of the room and down the hallway, hitting her in the back of the head with the gun. *Id.* They went to the living room where Ms. Johnson's brother, Ronald, was asleep on the couch. *Id.* Mr. Bennett pushed Ms. Johnson onto Ronald. *Id.* Mr. Bennett noticed the front door was open, realized that Mildred and Brandon had left the apartment, and went outside. *Id.* Ms. Johnson heard gunfire and saw flashes. *Id.* When Ms. Johnson went to the door, Mildred returned to the apartment and fell onto the porch. Ms. Johnson told her to play dead. *Id.* She then saw Mr. Bennett approaching and dragged Mildred inside. *Id.* at 50. Ms. Johnson tried to close the door, but Mr. Bennett put his hand inside and fired the gun. *Id.* Mr. Bennett came inside, and there was a struggle. *Id.* When it looked like Mr. Bennett was about to shoot Mildred again, Ms. Johnson stepped in front of Mildred and was shot in the leg. Mr. Bennett then walked out of the apartment. *Id.* Ms. Johnson looked out of the window and saw her oldest son Scottie, who lived next door, on the sidewalk. *Id.* at 51. Mr. Bennett pointed the gun at Scottie's face as Ronald pulled Ms. Johnson away from the window.[2] *Id.*

---

[2] Scottie reported to the police that he heard shots, came outside, and confronted Mr. Bennett. (Doc. 21 at 16.) Mr. Bennett pointed the gun at Scottie's face and pulled the trigger. Scottie heard a "click," but the gun did not fire. *Id.* Mr. Bennett then left the scene. *Id.* A nine millimeter semi-automatic handgun was recovered from the glove compartment of Mr. Bennett's ex-wife's car. *Id.* at 19.

Mildred also testified. Her testimony was consistent with Ms. Johnson's, but with the following additional relevant facts. Mildred testified that she ran to Scottie's house when she left the apartment, but that she could not get him to wake up. *Id*. at 60. Mr. Bennett came out of Ms. Johnson's apartment, pulled out the gun, and started shooting at Mildred and Brandon.[3] *Id*. at 60-61. Her last memory of the night was of falling onto Ms. Johnson's porch. *Id*. at 62.

Mr. Bennett presented a mental health expert and several character witnesses at sentencing. The character witnesses generally testified that he was of good character, that he was generous and hard-working, and that he had put forth an extraordinary effort in caring for his family over the years. They also testified that he was under immense stress and taking many medications at the time of the shootings. A psychologist who examined Mr. Bennett after the shootings confirmed that Mr. Bennett had a history of depression and an anxiety disorder. *Id.* at 26-27. Mr. Bennett was taking a number of prescription medications which "would compete with each other." *Id.* at 27. He suffered a "breakdown" leading to "a very intense pattern of bad behavior . . . in Randolph County followed by, within hours, other behavior in Alamance County."[4] *Id*. at 27-28.

### III. Mr. Bennett's Claims

Mr. Bennett raises three claims for relief in his Amended Petition. First, he alleges that the prosecutor violated his rights under the Fourteenth Amendment to the Constitution by promising concurrent sentences with a maximum total sentence of 125 months in prison if he pled guilty, but then allowing Mr. Bennett to be sentenced to 282 to 366 months in prison. (Doc. 5.)

---

[3] Brandon ran away when Mr. Bennett started firing and was able to make it to a nearby friend's house after being shot. (Doc. 21 at 18.)

[4] The "other behavior" in Alamance County led to the kidnapping charge and conviction in that county. Mr. Bennett apparently kidnapped his ex-wife immediately following the shootings in Randolph County. (Doc. 10-5 at 17.)

4

Second, Mr. Bennett claims he received ineffective assistance of counsel because his attorneys did not object to his sentence being greater than promised, did not object to the victims in the case testifying, did not question the victims, did not place Mr. Bennett on the witness stand at sentencing, misled Mr. Bennett about the terms of the plea bargain, and were generally unprepared. *Id.* Finally, he claims that his guilty plea is invalid because he pled guilty believing that he would receive a maximum of 125 months in prison and that his victims would not have to take the witness stand. *Id.*

## IV. Standards of Review

Because Mr. Bennett raised these claims before the state courts where they were adjudicated on the merits, this Court must apply the deferential standards of 28 U.S.C. § 2254(d). That statute precludes habeas relief in cases where a state court has considered a claim on its merits unless the petitioner shows that the "decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court" *or* the state court decision "was based on an unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d); *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011). State court findings of fact are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Here, the substance of Mr. Bennett's claims was raised in his motion for appropriate relief in state court and the claims were denied on their merits. It is true that the order denying the motion for appropriate relief was of a summary nature, without much discussion of the claims or issues. Nevertheless, it was a decision on the merits and is entitled to deference because § 2254's standards apply even where the state court does not cite to federal law or explain its reasoning.

5

*Early v. Packer*, 537 U.S. 3, 8 (2002) (ruling that state court need not cite relevant Supreme Court cases for decision to merit deference); *see Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000).

### V. Discussion

#### A. Claim One

Mr. Bennett first alleges that the prosecutor in his case breached his plea agreement by promising that Mr. Bennett would serve concurrent sentences with no more than 125 months if he pled guilty, but then allowing him to be sentenced to far more time. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). Where the contents of a plea bargain are at issue, courts will apply the traditional principles of contract. *United States v. McIntosh*, 612 F.2d 835, 837 (4th Cir. 1979). Unless the agreement is ambiguous, parole evidence is ordinarily inadmissible to vary the terms of an otherwise definite agreement. *Hartman v. Blankenship*, 825 F.2d 26, 29 (4th Cir. 1987).

The terms of Mr. Bennett's plea agreement were written on his Transcript of Plea form and were unambiguous. The agreement plainly stated that Mr. Bennett would plead guilty to four counts of attempted first-degree murder and one count of first-degree burglary, that the burglary charge would be consolidated with one attempted murder charge for sentencing, that sentencing would be left to the discretion of the judge, and that the state would make no recommendation as to punishment beyond presenting a factual basis and presenting victim testimony on punishment. (Doc. 10-2.) The form did not contain any promise of concurrent sentences or limit the maximum punishment to 125 months of imprisonment. In fact, it noted that Mr. Bennett faced up to 2149 months of imprisonment before the consolidation of the burglary charge was taken into account. *Id.* Consolidation of that charge reduced the potential maximum to 1920 months.

6

Mr. Bennett supports his claim with numerous affidavits from himself, his friends, and his relatives. This proffered evidence runs afoul of the parole evidence rule in *Hartman*. Further, even if the affidavits could be considered, none of them claims that the persons signing the affidavits ever heard the prosecutor make the promise alleged by Mr. Bennett. Instead, they claim only that Mr. Bennett's attorneys said that they had made a deal with the prosecutor to limit Mr. Bennett's sentence.

In the end, no evidence in the record reflects that Mr. Bennett or any of his witnesses ever heard the prosecutor make a promise of concurrent sentences or a 125-month maximum sentence. On the other hand, there is clear evidence in the Transcript of Plea form that the terms of the plea agreement did not include promises of concurrent sentences or a 125-month maximum. This agreement was initialed by the prosecutor and placed into the record. It stands as the prosecutor's only statement as to the terms of the plea agreement and it contradicts Mr. Bennett's unsupported claim. Given this record, the Court cannot say that the state court's adjudication of Mr. Bennett's motion for appropriate relief was contrary to, or an unreasonable application of, applicable Supreme Court law. Likewise, to the extent that the denial of the motion for appropriate relief rested on an implied factual finding that the prosecutor did not make the alleged promise, Mr. Bennett has not rebutted that finding through clear and convincing evidence.

**B.   Claim Two**

Mr. Bennett's next claim is that he received ineffective assistance of counsel because his attorneys (1) did not object when the terms of the plea bargain were not followed at sentencing, (2) did not object when the victims were called to testify, (3) did not attempt to question the victims, (4) did not call Mr. Bennett to testify at sentencing, (5) lied to Mr. Bennett and his family about the terms of the plea bargain, and (6) were generally unprepared and unresponsive at sentencing.

7

In order to prove ineffective assistance of counsel, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. *See Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner is not entitled to a hearing based upon unsupported, conclusory allegations. *See Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992) (in order to obtain an evidentiary hearing a habeas petitioner must come forward with some evidence that the claim might have merit), *abrogated on other grounds as recognized in Yeatts v. Angelone*, 166 F.3d 255, 261 n.4 (4th Cir. 1999).

The petitioner bears the burden of affirmatively showing deficient performance. *See Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994). To show prejudice following a guilty plea, a petitioner must establish that there is a reasonable probability that but for counsel's allegedly deficient conduct, he would not have pled guilty but would have gone to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *cf. Lafler v. Cooper*, ___ U.S. ___, ___, 132 S.Ct. 1376, 1384 (2012) (holding that the defendant must show the outcome of the plea process would have been different with competent advice.). The Court must determine whether "a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, ___ U.S. ___, ___, 130 S. Ct. 1473, 1485 (2010) (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 480, 486 (2000)). This determination is an objective one which is "dependent on the likely outcome of a trial had the defendant not pleaded guilty." *Meyer v. Branker*, 506 F.3d 358, 369 (4th Cir. 2007).

Several of Mr. Bennett's ineffective assistance of counsel claims are either too conclusory to proceed or fail in short order. His first allegation, that his attorneys did not object when the terms of the plea bargain were not followed at sentencing, is one of these. As already discussed in conjunction with Mr. Bennett's first claim, the terms of the plea bargain, as reflected on the

8

Transcript of Plea form, were followed exactly at sentencing. Therefore, his attorneys had no basis for any objection. They did not err by not objecting and also did not prejudice Mr. Bennett by not raising a meritless objection. The same is true for the claim that they did not object to the victims' testimony. The record shows that the plea bargain explicitly allowed the prosecution to put the victims on the stand for sentencing purposes. There were no grounds for any objection.

Mr. Bennett's next two ineffective assistance of counsel claims, as well as his sixth allegation, are all conclusory. Mr. Bennett states that his attorneys should have questioned the victims, but does not specify what questions should have been asked or explain how they would have aided his cause. Likewise, he claims that his attorneys should have put him on the stand to testify after the victims had testified, but does not state what purpose this would have served. Mr. Bennett's contention up to the time of his plea and sentencing was that he had no memory of the events surrounding the shooting of the victims. Indeed, although Mr. Bennett claimed in his motion for appropriate relief that he had partially recovered his memory, he still stated that, as of his sentencing, he had no memory of the events in question. (Doc. 10-4 at 3.) Therefore, it is not clear how his testimony could have in any way countered or contradicted the testimony given by the victims.

Next, Mr. Bennett states that his attorneys were "not prepared" and "unresponsive" at sentencing. In general, he has not given any real detail as to this claim, much less supported it with evidence. The one possible exception is a statement in Mr. Bennett's supporting brief filed in conjunction with his Motion for Summary Judgment. (Doc. 14 at 6-7.) There, he makes an allegation that his attorneys failed to subpoena Ms. Johnson's brother Ronald and an alleged drug dealer who lived across the street. *Id.* Mr. Bennett claims that they may have been part of the reason he was angry on the night of the shootings. *Id.* Mr. Bennett has not presented evidence of

9

what those witnesses' testimony would have contained other than to speculate that they might have provided a motive for the shootings. It is not clear how this would have helped his case in any event given that he only chased and shot unarmed children and adults who were not involved in any dispute Mr. Bennett may have had with Ronald or the neighbor.

Mr. Bennett's remaining ineffective assistance of counsel allegation, and the main focus of his claim, is that his attorneys intentionally or mistakenly led him to believe that he faced concurrent sentences with a maximum prison time of 125 months. He adds that he was also told that his victims would not have to testify if he pled guilty and that he wished to spare them having to relive the crimes. Mr. Bennett relies on the affidavits of family and friends to support his contentions. Taken as a whole, the affidavits indicate that Mr. Bennett's attorneys told him and his family that a deal had been made with the prosecutor, that the prosecutor had talked with the sentencing judge, that Mr. Bennett would face no more than 125 months in prison if he pled guilty, and that the victims would not take the stand to testify.

Respondents oppose the consideration of most of these affidavits. They note that, although several of the affidavits are in the state court record, most are dated after the denial of Mr. Bennett's motion for appropriate relief by the trial court. Respondents state that the affidavits were added during Mr. Bennett's attempt at receiving a writ of certiorari from the North Carolina Court of Appeals. They argue that the affidavits were not properly presented for a full round of review in the state courts and, therefore, cannot be considered by this Court. (Doc. 15 at 2-3.) They also point out that Mr. Bennett has presented a number of affidavits for the first time in this Court and they seek to have those affidavits excluded for similar reasons. Even considering all of Mr. Bennett's affidavits, they make no difference in the outcome of the case.

10

All of the affidavits say, in one way or another, that Mr. Bennett's lawyers told the affiant that Mr. Bennett's plea agreement limited his exposure to a long prison term.  For example, in the two affidavits which were clearly before the MAR court, Clarence Alvin Owen, Jr., states that he and his father were told on two separate occasions by one of Mr. Bennett's attorneys that Mr. Bennett would receive a sentence of "125 months or 10 years 8 months" if he pled guilty, (Doc. 10-5 at 7), and Clarence A. Owen, Sr., states that he was told that if Mr. Bennett pled guilty "his sentences would run concurrently with a maximum time of 10 years 8 months."  (Doc. 10-5 at 8.)

In connection with this action, Mr. Bennett has supplied a new affidavit from himself, in which he avers that he did not understand the "open" nature of his plea bargain because he was not given his medicine for attention deficit disorder while in jail.  (Doc. 1-1 at 15.)  He also swears that if he had known the judge had the discretion to sentence him as he did, he would have gone to trial rather than accept the plea offer.  *Id.*

Mr. Bennett has raised a substantial issue as to whether his attorney's performance fell below a reasonable standard for defense attorneys.  It would not be appropriate for Mr. Bennett's attorneys to have misrepresented the terms of a plea agreement to their client.  An attorney must correctly inform the defendant of the direct consequences of his plea.  See *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998); *Laycock v. State of N.M.*, 880 F.2d 1184, 1186 (10th Cir. 1989).  The affidavits submitted to the state court in connection with the MAR raise a factual question about whether defense counsel accurately conveyed the terms of the plea agreement.

On the other hand, there is the unambiguous language of the written plea agreement, Mr. Bennett's written statement that the written plea agreement was his "full" agreement, (Doc. 10-2 at 3), and similar statement to the trial judge under oath.  Some of the affidavits, including some of Mr. Bennett's, reference the attorneys stating that the plea offer was for an "open" plea.  This is

11

consistent with a plea where the sentencing judge retains sentencing discretion, rather than one where a particular range has been agreed upon. In other words, it is exactly the plea reflected by the written Transcript of Plea and is consistent with the actions of defense counsel, the prosecution, and the judge at Mr. Bennett's plea and sentencing. It may have also been the attorneys' expectation that they could successfully argue for concurrent sentences. Several courts have held that "[a] miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally deficient performance rising to the level of ineffective assistance of counsel." *United States v. Gordon*, 4 F.3d 1567, 1570-71 (10th Cir. 1993) (collecting cases).

The Court need not resolve this uncertainty. Even if the Court were to conclude that Mr. Bennett had produced evidence of deficient performance, Mr. Bennett must still show prejudice. In doing this, Mr. Bennett faces at least two hurdles that he cannot clear. First, he would need to show that a reasonable defendant in his situation, if he understood that he faced the possibility of consecutive sentences, would have gone to trial rather than accept the plea bargain. *Hill,* 474 U.S. at 60; *Meyer*, 506 F.3d at 369-370. Mr. Bennett states that he would have gone to trial if he had known he could get consecutive sentences. However, he does not explain why this would have been at all reasonable given the situation he faced. As noted previously, although Mr. Bennett later claimed to have recovered some of his memories of the night he committed his crimes, he maintained at the time of his plea that he could not remember anything. Thus, he could not have taken the stand at trial or helped his attorneys challenge the statements of the eyewitnesses to the crimes. Mr. Bennett's victims, some of whom testified as part of his sentencing just as the written plea bargain stated they could, did remember his crimes and gave testimony that would have been devastating at any trial. Mr. Bennett's former girlfriend and her daughter testified that Mr. Bennett entered their home at night, threatened and chased them with a gun, and shot at them.

12

There is absolutely no reasonable prospect that a trial would have resulted in anything other than convictions on the same charges to which Mr. Bennett pled guilty.[5]

Moreover, there is no reason to believe that Mr. Bennett's sentences would have been lower after a trial. In fact, they could well have been higher if the fourth attempted murder charge or consolidated burglary charge sentences were made consecutive, if all of the sentences were made consecutive to Mr. Bennett's sentence in Alamance County, or if the prosecution argued for higher sentences or for a higher sentencing range. As it was, Mr. Bennett received partially consecutive sentences after pleading guilty. More importantly, all of the sentences were in the mitigated range of possible sentences for his crimes. (Doc. 21 at 107-09.) There is a substantial possibility that Mr. Bennett's total sentence would have been higher following a trial.

In the end, Mr. Bennett's options were to either accept the plea offer with sentencing left to the discretion of the judge (an option which removed some sentencing exposure, did not allow the prosecution to argue for a higher sentence, and provided at least a chance for concurrent sentences) or to go to trial with a near certainty that he would be convicted and face sentencing with the real risk of a worse outcome. Any reasonable person would make exactly the choice that Mr. Bennett did make and accept the plea offer.

The other insurmountable obstacle for Mr. Bennett is that there is no prejudice from counsel's allegedly inaccurate sentence or parole predictions where the court cured any alleged defect by providing the proper information. *See U.S. v. Foster,* 68 F.3d 86, 88 (4th Cir. 1995).

---

[5]Mr. Bennett points to matters such as his possible motives in entering the home or what may have caused him to be upset and argue with his ex-girlfriend. These things are irrelevant to his guilt or innocence. Whatever sparked the incident, the clear evidence available at the time of Mr. Bennett's change of plea—in fact the only evidence available at that time—was that he intentionally chased and shot two children, shot his ex-girlfriend as she protected one of the children, and tried to shoot her adult son in the face.

13

Case 1:09-cv-00647-CCE-LPA   Document 26   Filed 12/10/12   Page 13 of 17

Here, the stenographic transcript of Mr. Bennett's change of plea hearing reveals that Mr. Bennett was advised on multiple occasions by the judge at his change of plea hearing that he faced the potential of more than ten to eleven years in prison. The judge first asked Mr. Bennett as to each attempted murder charge whether he understood that he was facing up to 480 months of possible confinement on the charge. In each instance, Mr. Bennett stated that he understood this. (Doc. 21 at 7-8.) The judge then asked if Mr. Bennett understood that he could receive a "maximum possible punishment [of] 229 **consecutive** months" for the burglary charge. *Id.* at 8 (emphasis added). He again stated that he understood this. *Id.* Finally, Mr. Bennett was asked if he understood that his "total maximum exposure to prison by way of [his] plea [was] 2,149 **consecutive** months." *Id.* (emphasis added). He answered affirmatively. Shortly thereafter, the judge instructed Mr. Bennett to "[l]isten carefully" and then read the terms of the written plea agreement, including the ones stating that "[s]entencing will be left to the discretion of the presiding judge" and that "[t]he State will make no specific recommendations towards sentencing other than . . . presenting a factual basis and presenting the victims' testimony on punishment." *Id.* at 9. Mr. Bennett affirmed that this was the agreement he was entering before also stating that no other promises or threats had been made. *Id*. at 9-10.

Based on this record, any miscommunication by counsel was more than amply cured by the judge presiding over the change of plea. For this reason, and because Mr. Bennett cannot show that a reasonable person in his position would not have accepted the plea bargain as he did, Mr. Bennett cannot show the prejudice required by *Strickland*. This also means that the state courts' rejection of the claims raised in his motion for appropriate relief was not contrary to or an unreasonable interpretation of *Strickland*. Mr. Bennett's ineffective assistance of counsel claim will be denied.

## C. Claim Three

Mr. Bennett's third, and final, claim for relief is that his guilty plea was not knowing and voluntary because he did not understand that he faced the possibility of consecutive sentences totaling nearly twenty-five years in prison or that his victims would testify at sentencing. "Because a plea of guilty is a solemn, judicial admission of the truth of the charge, a prisoner's right to contest it is usually, but not invariably, foreclosed." *Via v. Superintendent, Powhatan Correctional Center*, 643 F.2d 167, 171 (4th Cir. 1981) (citing *Blackledge v. Allison*, 431 U.S. 63 (1977)). In order to collaterally attack a guilty plea, a petitioner must present valid reasons why his statements at the time of his plea should not be accepted as true. *Id.* at 172; *see also Edmonds v. Lewis*, 546 F.2d 566, 567-568 (4th Cir. 1976). Therefore, as an initial matter, the Court must look to see whether Mr. Bennett's claims conflict with his statements at the time of his plea and, if so, whether Mr. Bennett has given valid reasons for the discrepancy. *Id.* at 171-172. "Absent clear and convincing evidence to the contrary, a defendant is bound by the representations he makes under oath during a plea colloquy." *Fields v. Attorney Gen. of Md.*, 956 F.2d 1290, 1299 (4th Cir. 1992) (citing *Blackledge*, 431 U.S. at 74-75; *Little v. Allsbrook*, 731 F.2d 238, 239-40 n.2 (4th Cir. 1984)); *see also Walton v. Angelone*, 321 F.3d 442, 462 (4th Cir. 2003).

Mr. Bennett's claim of an unknowing or involuntary plea fails for some of the same reasons as his previous claim. As already discussed, the judge who accepted his plea told him multiple times that he faced the possibility of consecutive sentences and/or far more than ten to eleven years in prison. In each instance, Mr. Bennett stated under oath that he understood this. He was also accurately told and the written plea Transcript of Plea form that he signed stated that sentencing would be in the discretion of the judge and that the victims could testify. He stated under oath that this was the agreement between himself and the State. In order to challenge his

plea, Mr. Bennett would have to present clear and convincing evidence that he did not actually understand the things that he swore he did understand.

Mr. Bennett has produced no such evidence. He has, of course, submitted the multiple affidavits from his friends and family. However, they really only serve as evidence that Mr. Bennett's attorneys may not have adequately explained the penalties Mr. Bennett faced if he signed the plea agreement. The unambiguous terms of the Transcript of Plea form, along with the presiding judge's multiple questions regarding the potential length of sentence at the plea colloquy would have dispelled any confusion.

Mr. Bennett also claims that he could not understand the plea proceedings because he had not been given his medicine for Attention Deficit Disorder and was being given "substitute drugs for Bi-Polar disorder and severe depression." (Doc. 14 at 5.) However, he has made only a bald statement that he needed such medication, that he had not received it, and that the medication he did receive was not effective. He has not presented clear and convincing evidence that any medication problems so reduced his mental ability that he could not understand the proceedings. The written and stenographic transcripts from his plea hearing reveal that he was able to read and write on a college level. Further, the transcripts in their entirety reveal no problems with Mr. Bennett understanding or answering the judge's questions. His answers were focused and coherent throughout.

Based on the transcript, it is not surprising that the state court denied Mr. Bennett's motion for appropriate relief. The denial was not contrary to, or an unreasonable application of, Supreme Court precedent. Therefore, Mr. Bennett is not entitled to relief in this Court either. His third claim for relief will be denied. This also means that Mr. Bennett's Motion for Summary Judgment will be denied, while Respondents' will be granted.

**IT IS THEREFORE ORDERED** that Respondents' Motion for Summary Judgment, (Doc. 9), is granted, that Mr. Bennett's Motion for Summary Judgment, (Doc. 13), is denied, and that the Habeas Petition, (Doc. 1), and Amended Habeas Petition, (Doc. 5), are denied.

This the 10th day of December, 2012.

_____
UNITED STATES DISTRICT JUDGE